IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE: ROBERT F. ROOD, IV,    :
et al.
_____    :
ROBERT F. ROOD, IV, et al.
    Appellants    :

    v.    :    Civil Action No. DKC 11-3059

GARY A. ROSEN, et al.    :
    Appellees
        :

**MEMORANDUM OPINION**

Appellants Robert F. Rood, IV, and Charles Timothy Jewell appeal from a November 4, 2011, judgment against them in a bankruptcy adversary proceeding in accordance with a memorandum of decision issued September 26, 2011.[1]  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the judgment will be affirmed.

**I.  Background**

    **A.  Events Prior to the Adversary Complaint**

Appellee Southern Management Corporation Retirement Trust ("SMCRT") is a pension plan that manages retirement funds for approximately 1,250 employees of Southern Management Corporation.  Between March 2006 and September 2007, SMCRT

---

[1] The appeals were noted on October 11, 2011, prior to the entry of judgment.  The notices are treated as if filed on the date of and after the entry of judgment.  Fed.R.Bankr.P. 8002(a).

funded thirty-two loans, primarily for short-term construction and renovation projects, originated by Appellant Robert F. Rood, IV, or a business entity associated with him.   Mr. Rood typically presented loan applications and supporting documentation to SMCRT's loan committee, which reviewed these packages and, upon approval, wired the funds to a settlement agent.   Mr. Rood then assisted with closing the loans, managed disbursements to the borrowers, and remitted monthly interest or payments to SMCRT, along with statements of accounting.

In mid-2007, Southern Management Chief Executive Officer David Hillman requested that Mr. Rood permit a routine audit of "his books and records to verify the amount that was supposed to be on deposit."   (ECF No. 5-47, at 75).[2]   Mr. Rood was initially agreeable, but later balked, citing privacy concerns for his clients.   When further efforts to examine his records were unsuccessful, Mr. Hillman called a meeting in October 2007.   At that meeting, Mr. Rood produced a letter from his attorney opining that he "had no duty to account to [SMCRT]" for its money.   (*Id*. at 75).   Ultimately, Mr. Rood agreed to have his own accountant, Lloyd Mallory, review the relevant records and prepare a report.   SMCRT received Mr. Mallory's report in March 2008, which was "basically an affirmative statement that the

_____

[2] Unless otherwise noted, all references are to evidence adduced at the trial in the adversary proceeding.

balances were there and that they were in a bank account and that . . . [the] bank balances equaled the amount of money that [Mr. Rood] owed to third parties." (*Id.* at 78).

At around the same time, however, SMCRT "began to be contacted by borrowers that were unable to access the funds that Mr. Rood was holding for them." (*Id.* at 79). When Mr. Hillman contacted other borrowers, he "learned that their interest escrows in some cases had been depleted," and that some borrowers "had paid off their loans," but SMCRT had not received the payments. (*Id.* at 82). Funds for another loan associated with a property on K Street in the District of Columbia had been released by SMCRT to a title company awaiting settlement. Mr. Rood reported to SMCRT that the loan "was being closed and [was] active" (*id.*), but Mr. Hillman learned from the title company that this was untrue – in fact, the loan never closed, and the money was sent by the title company to Mr. Rood, upon his request.

On May 9, 2008, SMCRT filed a lawsuit against Mr. Rood and two of his associated business entities in the Circuit Court for Montgomery County, Maryland. Pursuant to an emergency motion, a temporary receiver was appointed to examine records related to SMCRT's loan portfolio, which Mr. Rood continued to resist providing. The receiver, Thomas Murphy, learned through an independent investigation that Mr. Rood had outstanding

3

judgments against him.   Upon contacting attorneys representing the plaintiff in one of those cases, Mr. Murphy learned that Mr. Rood had been entrusted with a large sum of money to assist a restaurant, Village Bar and Grill, in obtaining a lease, and that, soon thereafter, "the money effectively disappeared." (ECF No. 5-56, at 35).[3]   Mr. Murphy issued a subpoena to the attorneys for Village Bar and Grill for bank records associated with Level One Capital Partners, LLC ("Level One"), an entity controlled by Mr. Rood.   His review of those records reflected that "[t]he majority of the money that was spent out of the Level One bank account . . . went for non-corporate expenses." (*Id.* at 37).   This caused Mr. Murphy to be "very, very concerned about what Mr. Rood was doing with funds."   (*Id.* at 38).

On May 29, 2008, after he was served with a subpoena to appear in circuit court the next day, Mr. Rood filed a voluntary petition under chapter 7 of the bankruptcy code in the United States Bankruptcy Court for the District of Maryland.   The following day, Mr. Rood failed to appear at the circuit court

---

[3]   On November 20, 2008, Mr. Rood was charged by an indictment in the Circuit Court for Montgomery County with embezzlement and fraudulent misappropriation by a fiduciary related to the money entrusted to him by Village Bar and Grill. (ECF No. 6-4).   He pleaded guilty on January 4, 2010, and was sentenced to a three-year term of imprisonment, all of which was suspended, and three years of supervised probation.

hearing, and Mr. Murphy was appointed as permanent receiver in his absence.

With Mr. Rood continuing to refuse to provide documents, Mr. Murphy retained a private investigation firm, Prudential Associates, to ascertain the location of relevant records. The assigned investigator, Jared Stern, learned that Mr. Rood's business entities were primarily operating from an office on Rugby Avenue in Bethesda, Maryland. When surveillance of that address suggested that Mr. Rood was in the process of destroying documents, Mr. Murphy filed an *ex parte* emergency motion for right of entry. On June 12, 2008, a judge of the Circuit Court for Montgomery County signed an order authorizing the receiver to enter the Rugby Avenue office and "remove the things that would be reasonably related . . . to [his] duties." (*Id.* at 42). Mr. Murphy, in turn, authorized Mr. Stern, Steven Michael, an attorney for SMCRT, and Suzanne Hillman, an accountant associated with SMCRT, to enter the property, accompanied by deputies of the Montgomery County Sheriff's Department. They did so the next day, removing voluminous documents, computers, and servers from the office. A computer forensic specialist with Prudential Associates copied the hard drives of all operable computers removed from the Rugby Avenue address.

Meanwhile, in Mr. Rood's bankruptcy case, Appellee Gary A. Rosen was appointed chapter 7 trustee. He filed voluntary

chapter 7 petitions on behalf of a number of entities controlled by Mr. Rood – namely, The Source, LLC; Blue Horseshoe Portfolio Services, LLC; Level One Capital Partners LLC (a Nevada limited liability company); Blue Horseshoe Capital, LLC; Matterhorn Financial, LLC; and Level One Capital Partners, LLC (a Maryland limited liability company) (collectively, "the Debtor Entities").  Mr. Rosen was appointed chapter 7 trustee for the Debtor Entities, and the bankruptcy court administratively consolidated the Debtor Entities' cases with Mr. Rood's bankruptcy case.

Pursuant to 11 U.S.C. § 341, a meeting of creditors in the chapter 7 cases was held on July 2, 2008, during which questions were posed to Mr. Rood regarding, *inter alia*, his sources of income.  Mr. Rood refused to answer, invoking his Fifth Amendment privilege.  On July 16, 2008, SMCRT and Tysons Financial, LLC ("Tysons"), another creditor, filed an emergency motion for examination of debtor pursuant to Federal Rule of Bankruptcy Procedure 2004.  The bankruptcy court granted that motion on July 21, 2008, ordering "that the Debtor produce any and all documents requested in the Motion within ten (10) days of entry of this Order" and that he "submit himself to a Rule 2004 examination." (Bankr. No. 08-17199, ECF No. 45).  When Mr. Rood failed to comply, he was ordered to produce all documents required under the prior order to SMCRT's attorneys no later

than August 19.   Mr. Rood again failed to comply, and, on September 19, 2008, the bankruptcy court issued a consent order on suggestion of contempt, directing Mr. Rood to make the Rugby Avenue office "immediately available for a videotaped inspection"; to "disclose any and all storage facilities in his custody or control"; to "immediately turn over his . . . PDA device" from which "a qualified intellectual technology professional . . . [was] to download and store electronically the Debtor's e-mails responsive to . . . [the Rule] 2004 examination"; and to produce enumerated documents.  (*Id.* at ECF No. 96).   Pursuant to that order, SMCRT obtained a number of documents that had not been produced.   At around the same time, Mr. Murphy transferred custody of the electronic and paper records removed during the prior entry into the Rugby Avenue office to Mr. Rosen.

Numerous adversary proceedings were subsequently commenced within the main bankruptcy case.   On January 30, 2009, SMCRT and Tysons filed a verified complaint to determine dischargeability of debt against Mr. Rood, alleging fraud and related claims. When Mr. Rood failed to respond to the complaint, SMCRT and Tysons filed a motion for default judgment, which the bankruptcy court granted on April 29, 2009.   The court ordered that SMCRT "shall have judgment against the Debtor . . . in the sum of $13,876,353.47"; "[t]hat Tysons . . . shall have judgment

7

against the Debtor . . . in the sum of $2,626,189.30"; and "[t]hat these debts are not subject to any discharge in this or any subsequently filed bankruptcy case." (Bankr. No. 09-00058, at ECF No. 12).[4]

## B. The Adversary Complaint and Events Prior to Trial

The instant adversary proceeding was commenced on April 1, 2009, when Mr. Rosen and SMCRT filed a complaint for injunctive relief, declaratory relief, and damages against Kore Holdings, Inc. ("Kore"); seven wholly-owned Kore subsidiaries; First Washington Equities, LLC; Nik Hepler; Warren A. Hughes, Jr.; Mr. Rood's mother and father; and Appellants Robert Rood and Charles Timothy Jewell. (ECF No. 1-5).[5]   Concomitantly with their

---

[4] Approximately one month earlier, in another bankruptcy case, a default judgment was entered against Mr. Rood and in favor of Village Bar and Grill, Inc., in the nondischargeable amount of $205,000.00. (Bankr. No. 08-00781, ECF No. 12).

[5] Kore is a publicly-held Nevada corporation with its principal place of business in Maryland. Mr. Rood is Kore's President and Chief Executive Officer; Mr. Jewell is Kore's Chief Operating Officer; and Mr. Hepler and Mr. Hughes are former Kore employees. The Kore subsidiaries named as defendants in the adversary complaint are Arcadian, Inc., First Washington Financial Corp., Level One Mortgage Capital, Mortgage American Bankers, Source Bio-Plastics, Inc., SunVolt, LLC, and Whiplash Motor Sports, LLC. Mr. Rood is identified as President and Chief Executive Officer of Defendant First Washington Equities, LLC, and Mr. Jewell is identified as its managing member.

By orders entered June 5, 2009, and March 12, 2010, the bankruptcy court dismissed certain claims against Mr. Rood's parents, Robert F. Rood, III, and Grace Ann Rood, and granted summary judgment as to others. Mr. Rosen and SMCRT appealed.

complaint, Appellees filed an emergency motion for temporary restraining order, preliminary injunction, and request for emergency hearing.  (ECF No. 6-1).  Attached to that document was the declaration of Suzanne D. Hillman, a principal in the accounting firm Hillman & Glorioso, PLLC, providing an analysis of records associated with Mr. Rood, Kore, and related entities. (ECF No. 6-3).[6]

The bankruptcy court held hearings on the preliminary injunction motion on a number of dates in April and May 2009. At an April 13, 2009, hearing, the court addressed Mr. Rood's failure to produce certain documents as directed by a subpoena. He was orally ordered to produce a post-petition agreement between two entities with which he was associated, Arcadian

By a memorandum opinion and order issued March 22, 2011, this court reversed and remanded as to one claim, but otherwise affirmed the bankruptcy court's decision.  *See In re Rood*, 448 B.R. 149 (D.Md. 2011).  On August 15, 2012, the bankruptcy court issued an order granting the trustee's motion to approve a settlement with respect to Mr. Rood's parents.  (Bankr. No. 09-00188, ECF No. 648).

Mr. Hepler noted an appeal from the same judgment as the instant appellants, which was consolidated in this court with those of Messrs. Rood and Jewell.  When Mr. Hepler failed to file a brief, Appellees moved to dismiss his appeal.  Mr. Hepler again failed to respond and his appeal was dismissed by a memorandum opinion and order issued March 6, 2012.  *See In re Rood*, Civ. No. DKC 11-3059, 2012 WL 748573 (D.Md. Mar. 6, 2012).

[6] Ms. Hillman is the spouse of Southern Management CEO David Hillman.  She was also among those who entered the Rugby Avenue property pursuant to the circuit court order.

Renewable Power, Inc., and Jet Stream Voltage, Inc., prior to April 17. (ECF No. 6-19, at 67). When he failed to produce the document, Appellees filed an emergency motion for an order to show cause why Mr. Rood and Kore should not be held in civil and criminal contempt and a request for hearing. A hearing on Appellees' motion was held on June 18, and, on June 22, the bankruptcy court issued a memorandum of decision and certificate of criminal contempt.[7]

On September 8, 2009, the bankruptcy court entered an order granting the motion for preliminary injunction as to Mr. Rood, Mr. Jewell, Mr. Hepler, Kore, Whiplash Motor Sports, LLC, Source Bio-Plastics, Inc., Arcadian, Inc., Level One Mortgage Capital, SunVolt, LLC, Mortgage American Bankers, First Washington

---

[7] The certificate of contempt was "handed-up" to the district court by the bankruptcy court for a hearing regarding punishment. On October 27, 2009, this court issued a memorandum opinion and order finding, in relevant part, that "if the matter of criminal contempt is to be pursued, a referral to the United States Attorney must be made." *In re Rood*, Misc. No. DKC 09-0186, 2009 WL 3614851, at *4 (D.Md. Oct. 27, 2009). Such a referral was subsequently made, and, on October 6, 2010, a criminal information was filed in the United States District Court for the District of Maryland, charging Mr. Rood with criminal contempt. (Crim. No. DKC 10-0618). On the same date, he was separately charged by indictment in this court with fraudulent use of a Social Security number, making a false statement to a financial institution, and aggravated identity theft. (Crim. No. DKC 10-0627, ECF No. 1). Additionally, on December 13, 2011, Mr. Rood, Mr. Hepler, and Lloyd Mallory were charged by a sixteen-count indictment in the United States District Court for the Eastern District of Virginia with theft and wire fraud related to their conduct with respect to SMCRT and Tysons. (Crim. No. 1:11CR52). Trial dates are pending in all three of those criminal cases.

Financial Corporation, and First Washington Equities, LLC, enjoining them, *inter alia*, "from taking any action or making any transfers of any property or assets or engaging in any financial or business transactions pending further Order of the Court." (ECF No. 6-68, at 7). Mr. Rood and Kore appealed to this court, which dismissed as to Kore and affirmed the bankruptcy court's ruling as to Mr. Rood. *See In re Rood*, 426 B.R. 538 (D.Md. 2010).

C.  **The Trial and Subsequent Proceedings**

A bench trial was held before United States Bankruptcy Judge Paul Mannes on April 6, 7, 8, 9, 14, 15, and 16; May 27 and 28; June 8; and July 15, 2010. Mr. Rood, who represented himself at trial, failed to appear for the first two days.[8] Prior to the last day of trial, SMCRT moved *in limine* for an order prohibiting him from testifying as a sanction for repeated discovery violations. (ECF Nos. 5-27, 5-29). The court granted that motion on July 12, 2010. (ECF No. 5-19).

After post-trial briefing and an additional hearing, Judge Mannes issued a memorandum of decision on September 26, 2011,

---

[8] On April 7, 2010, Mr. Rood filed a second bankruptcy case, under chapter 11, in the United States Bankruptcy Court for the Southern District of Florida. On the same date, he filed a chapter 11 petition on behalf of Kore in the United States Bankruptcy Court for the District of Nevada. The Florida case was subsequently transferred to Maryland, converted to chapter 7, and consolidated with the existing case here. The Nevada case was also transferred to Maryland and converted to chapter 7.

11

finding, *inter alia*, Mr. Rood liable for fraud and civil conspiracy (counts I and III of the adversary complaint) in the amount of $4,441,750.00, and for fraudulent conveyance of corporate assets (count VIII) in the amount of $1,017,393.33. (ECF No. 1-1). Mr. Jewell was found liable under the same counts in the amounts of $500,000.00 and $7,100.00, respectively. A nominal punitive damages award of one dollar was assessed against both defendants. On November 4, 2011, the bankruptcy court entered a final judgment in accordance with its prior memorandum of decision. (ECF No. 13-12).

Mr. Jewell and Mr. Rood (together, "Appellants") timely filed notices of appeal and the cases were subsequently consolidated in this court. Following designation of the record, Mr. Jewell, who is proceeding *pro se* on appeal, filed his brief on February 1, 2012. (ECF No. 17). Mr. Rood, who is represented by counsel, filed his brief on March 2. (ECF No. 26). Appellees filed a consolidated opposition brief on March 23 (ECF No. 35), and both appellants filed replies (ECF Nos. 36, 37).

## II. Standard of Review

The district court reviews a bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. *In re Official Comm. of Unsecured for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006); Fed.R.Bankr.P. 8013. "The

Supreme Court of the United States has held that '[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re Fitzwater*, No. 2:11-cv-00934, 2012 WL 4339559, at *2 (S.D.W.Va. Sept. 21, 2012) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *In re Broyles*, 55 F.3d 980, 983 (4th Cir. 1995).  "On legal issues, this [c]ourt 'must make an independent determination of the applicable law.'" *In re Fabian*, 475 B.R. 463, 467 (D.Md. 2012) (quoting *In re Jeffrey Bigelow Design Group, Inc.*, 127 B.R. 580, 582 (D.Md. 1991)).  With respect to the bankruptcy court's application of law to the fact, the district court review for abuse of discretion.  *In re Fabian*, 475 B.R. at 467 (citing *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992)).

## III. Sufficiency of the Evidence

Both Mr. Rood and Mr. Jewell challenge the sufficiency of the evidence adduced at trial in a number of respects.  As to both appellants, however, the evidence was more than sufficient to support liability.

The court below found Mr. Rood and Mr. Jewell liable for fraud and/or civil conspiracy and for fraudulent conveyances attributable to them.  In *Hoffman v. Stamper*, 385 Md. 1, 28

(2005), the Court of Appeals of Maryland set forth the relevant standard for establishing fraud:

> To prove an action for civil fraud based on affirmative misrepresentation, the plaintiff must show that (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

In the same case, the court set forth the legal standard for conspiracy:

> We have defined a civil conspiracy as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *Green v. Wash. Sub. San. Comm'n*, 259 Md. 206, 221, 269 A.2d 815, 824 (1970). Although the notion of a tortious conspiracy was derived from the common law criminal conspiracy and each requires proof of an agreement, the tort plaintiff must show more than just an unlawful agreement. The plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury. *See Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 189-91, 665 A.2d 1038, 1044-45 (1995) and cases cited there. The tort actually lies in the act causing the harm; the agreement to commit that act is not actionable on its own but rather is in the

14

> nature of an aggravating factor.  That is
> why this Court, in *Alleco*, held that civil
> conspiracy "'is not a separate tort capable
> of independently sustaining an award of
> damages in the absence of other tortious
> injury to the plaintiff.'"  *Alleco*, *supra*,
> 340 Md. at 189, 665 A.2d at 1044-45 (quoting
> *Alexander & Alexander, Inc. v. B. Dixon
> Evander & Associates, Inc.*, 336 Md. 635, 645
> n. 8, 650 A.2d 260, 265 n. 8 (1994)).

*Hoffman*, 385 Md. at 24-25.

Conspiracies are most often proven by circumstantial
evidence, "for in most cases it would be practically impossible
to prove a conspiracy by means of direct evidence alone."  *Id*.
at 25 (quoting *Western Md. Dairy v. Chenowith*, 180 Md. 236, 243
(1942)).  As the court explained in *Chenowith*, 180 Md. at 243-
44:

> Conspirators do not voluntarily proclaim
> their purposes; their methods are
> clandestine.  It is sufficient if the proven
> facts and circumstances, pieced together and
> considered as a whole, convince the court
> that the parties were acting together
> understandingly in order to accomplish the
> fraudulent scheme.  Thus a conspiracy may be
> established by inference from the nature of
> the acts complained of, the individual and
> collective interest of the alleged
> conspirators, the situation and relation of
> the parties at the time of the commission of
> the acts, the motives which produced them,
> and all the surrounding circumstances
> preceding and attending the culmination of
> the common design.

Where two or more people conspire to defraud, "each of them is
liable to the defrauded party irrespective of the degree of his

activity in the fraudulent transaction or whether he shared in the profits of the scheme." *Fisher v. McCrary Crescent City, LLC*, 186 Md.App. 86, 144 (2009). Moreover, it is unnecessary to show that a participant in the conspiracy "was a party to its contrivance at its inception." *Fisher*, 186 Md.App. at 144. Rather, "[i]f it is shown that he knew of the fraudulent scheme and willfully aided in its execution, he is chargeable with the consequences." *Id*.

The applicable law for the fraudulent conveyance count alleged in the adversary complaint is Maryland's Uniform Fraudulent Conveyance Act, Md. Code Ann., Comm. Law § 15-201 *et seq*. ("MUFCA"). As this court explained in *Bassi & Belotti S.p.A. v. Transcontinental Granite, Inc.*, No. DKC 08-1309, 2011 WL 856366, at *9 (D.Md. Mar. 9, 2011):

> [MUFCA] provides a remedy if a creditor demonstrates that a conveyance was made without fair consideration and either (1) was committed by a person or entity who is or will be rendered insolvent by the conveyance (§ 15-204), (2) was committed by a person or entity engaged or about to be engaged in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital (§ 15-205), or (3) was committed by a person or entity who intends to or believes that he will incur debts beyond his ability to pay when he undertakes the conveyance (§ 15-206). MUFCA also imposes liability for conveyances made with actual intent to hinder, delay, or defraud present or future creditors, regardless of whether there was fair consideration for the

transfer in § 15-207. The only remedies available under MUFCA are that the creditor may seek to set aside the conveyance or levy or garnish the property transferred by the conveyance. See § 15-209; *Frain v. Perry*, 92 Md.App. 605, 620 n. 7, 609 A.2d 379 ("Under Maryland law, once a conveyance is proven to be fraudulent, a creditor has the option of either having the conveyance set aside or attaching the property conveyed."), *cert. denied*, 328 Md. 237, 614 A.2d 83 (1992). Cases interpreting the statute have expanded the realm of available remedies to include suits for money judgments against the transferee where he or she "allows or causes the property to depreciate in value or parts with the property without sufficient consideration or puts it beyond the reach of the court." *Damazo v. Wahby*, 269 Md. 252, 257, 305 A.2d 138 (Md.1973).

(Footnotes omitted).

### A.   Mr. Rood

The evidence adduced at trial in the bankruptcy court amply demonstrated Mr. Rood's liability for fraud and civil conspiracy. Through extensive testimony and voluminous exhibits, Appellees showed how Mr. Rood repeatedly originated loans for SMCRT and, once they were funded, misappropriated the money by diverting it to accounts associated with the Debtor Entities and then spending it according to his whims. With the assistance of Mr. Hepler and Mr. Mallory, Mr. Rood made material misrepresentations to SMCRT and the borrowers as to the status of the loans. These accounts were meticulously summarized in

17

the bankruptcy court's memorandum of decision, *see In re Rood*, 459 B.R. 581 (Bankr.D.Md. 2011), and need not be repeated here.

In arguing that the evidence was insufficient, Mr. Rood does little more than recite the applicable legal standard and advance vague, generalized arguments, largely without citation to the record or any relevant legal authority. *See* Fed.R.Bankr.P. 8010(a)(1)(E) ("The brief of the appellant shall contain . . . [a]n argument . . . with citations to the authorities, statutes and parts of the record relied on"). It is not for this court to scour the record in search of potential bases for his arguments. For present purposes, it suffices to say that the bankruptcy court's findings of fact and conclusions of law with respect to Mr. Rood's liability will not be disturbed. The evidence of his culpability as to the fraud count was overwhelming.

According to Mr. Rood, the conspiracy count cannot stand because "it is impossible for him to conspire with himself and/or agents of the companies he operated and served as a princip[al] officer." (ECF No. 26, at 9-10). Judge Mannes specifically addressed this argument, at length, in the memorandum of decision:

> Defendants argue that a conspiracy cannot occur between a corporation and its agents acting within the scope of their employment. *Fraidin v. Weitzman*, 93 Md. App. 168, 235, 611 A.2d 1046, 1079 (1992)

18

("A person's acts will be deemed within the scope of employment when they are taken in furtherance of the business of the employer and are authorized by the employer.")[;] *Brown v. Mayor and City Council*, 892 A.2d 1173, 1183, 167 Md. App. 306, 323 (2006). . . . The Defendants argue that the corporate Defendants are all . . . affiliates or subsidiaries of Kore and therefore cannot conspire with one another. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731 (1984) (holding that a parent and its wholly owned subsidiary are legally incapable of conspiring with one another). *See also Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (CA4 1991).

Plaintiffs' response to this argument based upon the intracorporate immunity doctrine is found in their consolidated rebuttal to Defendants' memoranda . . . stating that an exception exists where the officer or agent has an independent personal stake in achieving the corporation's illegal objectives. *See [ePlus] Tech., Inc. v. Aboud*, 313 F.3d 166, 170 (CA4 2002); *Shoregood Water Co., Inc. v. U.S. Bottling Co.*, 2009 WL 2461689 (D.Md. Aug. 10, 2009); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (CA4 1997). Based on the court's conclusions that Rood, Hepler, and Jewell were the beneficiaries of the transfers of the diverted SMCRT loan proceeds, the court finds that each of them had a stake in ensuring the success of this scheme.

(ECF No. 1-1, at 24).

Mr. Rood acknowledges that "[i]n order to hold an employee liable as a co-conspirator, the individual must act beyond the scope of his employment, act for a personal purpose, or have an independent personal stake in the subject of the conspiracy," but asserts "[t]his cannot be said of any act or motivation on

the part of Rood." (ECF No. 26, at 36). According to Appellant, because "[t]he evidence and testimonies of Plaintiffs' witnesses are inconsistent with the exception to the doctrine, the conspiracy count should be dismissed." (*Id.*).

Mr. Rood does not offer an explanation as to the manner in which Appellees' witnesses testified inconsistently with the exception, however, nor could he. Indeed, the evidence adduced at trial uniformly showed that the Debtor Entities had been insolvent since 2006 and were used by Mr. Rood as corporate shells to facilitate his illegal activities. As Ms. Hillman testified at a prior hearing, Mr. Rood typically "[took] money out of Blue Horseshoe and Level One accounts and convert[ed] the funds to money orders"; in other words, he "used the SMCRT funds that were entrusted to him to invest on its behalf as his personal piggy bank." *In re Rood*, 448 B.R. 149, 153 (D.Md. 2001) (quoting *In re Rood*, Bankr. No. 09-0188PM, 2009 WL 2923429, at *2 (Bankr.D.Md. Aug. 19, 2009) (footnote omitted); *see also ePlus Tech.*, 313 F.3d at 179-80 (applying independent personal stake exception where conspirators used corporation under their control to defraud creditors using a bankruptcy fraud scheme). "The point of the [personal stake] exception is that there can be no unity of purpose between a corporation and its agents if the agents have a personal stake independent of the interests of the corporation." *See Baylor v. Comprehensive*

*Pain Management Centers, Inc.*, No. 7:09cv00472, 2011 WL 1327396, at *13 (W.D.Va. Apr. 6, 2011).   Here, the interests of the corporate entities and their agents were clearly not aligned. The court finds no error in the bankruptcy court's application of the independent personal stake exception.

With respect to the fraudulent conveyance count, the bankruptcy court explained:

> The Hillman Report offers the following description of the nature of these fraudulent transfers: "Rood additionally diverted principal repayments intended for SMCRT to his [*i.e.*, Debtor Entity] bank accounts without proper authorization.   The Debtor withdrew from the bank accounts that held these funds substantial payments to third parties that had no business purpose and which drained the Debtors' cash and resulted in a constant and continued state of insolvency for the Debtors" (P.3).   From the evidence produced, it is clear that Rood alone controlled the Rood Entity Accounts. *See* Hillman Report, 3; Pl. Ex. 66 (Tr. TRO Hr'g, 4/2/09, 30); Trial Tr., Suzanne Hillman Test., [7/17/09, 20].

(ECF No. 1-1, at 17-18).   Judge Mannes then recited "a litany of examples" set forth in the complaint – which he clearly credited – "of how Rood used the Rood Entity Accounts to fund a lavish lifestyle, as well as to 'share[] "gifts" of down payments, and indeed, complete auto purchases, for his co-conspirators.'" (*Id.* at 18).   According to the Hillman Report, Mr. Rood "regularly used the [five] Debtor Entity bank accounts to pay his various personal expenses including (but not limited to) . .

21

. luxury vehicles[,] . . . rent for his personal residence[,] . . . meal and entertainment[,] . . . and clothing and jewelry[.]" (*Id.*).

After setting forth the relevant standard under MUFCA, the bankruptcy court explained that an inference of fraud arose due to "numerous badges of fraud," as established by the "wholly credible trial testimony of Suzanne Hillman." (*Id.* at 20-21). Thus, Judge Mannes determined, the burden shifted to Appellants to "prove fair consideration." (*Id.* at 21 (citing *Kline v. Inland Rubber Corp.*, 194 Md. 122, 138 (1949); *A.V. Laurins & Co., Inc. v. Prince George's County*, 46 Md.App. 548, 550 (1980)). Implicitly finding that no such proof was offered by Mr. Rood, the bankruptcy court turned to Ms. Hillman's calculations of damages, carefully parsing each amount and deducting those for which it found insufficient evidence to support.

On appeal, Mr. Rood argues that "[t]here was no basis in law or fact to support the verdict . . . because the transfers were ordinary and necessary expenses Mr. Rood and the corporate debtors incurred." (ECF No. 26, at 10). In truth, however, he merely disagrees with the bankruptcy court's reliance on the Hillman Report – specifically, its findings that the "Debtor Entities were insolvent, that the Debtor Entities received less than reasonably equivalent value in exchange for each transfer,

and that the transfers made by the Debtor Entities to each of the Defendants were without fair consideration." (*Id*. at 40-41). Mr. Rood "denies that the Debtor Entities were [in fact] insolvent during the relevant times" and asserts that he "would have been able to prove it but for the Court's sanctions." (*Id*. at 41). He further asserts that "the Trustee failed to meet his burden of showing that Debtor did not receive fair consideration for the monies [he] expended," generally arguing that he "received consideration for personal expenses." (*Id*.).

In contrast to the detailed findings of the bankruptcy court's decision, which were amply supported by citations to the trial record and proper legal support, Mr. Rood fails to substantiate his argument in any meaningful way. Indeed, the record does not appear to support his view of the evidence. Accordingly, the bankruptcy court's finding of liability against Mr. Rood for fraudulent conveyances and its assessment of damages were entirely proper.

### B.   Mr. Jewell

The involvement of Mr. Jewell, as the bankruptcy court noted, was more "difficult . . . to discern." (ECF No. 1-1, at 14). It was undisputed that Mr. Jewell had been an acquaintance of Mr. Rood's for many years; that he at some point came to work with Mr. Rood at the Rugby Avenue office; that he was the Chief Operating Officer of Kore, the parent company of the Debtor

Entities, at the same time Mr. Rood was Kore's Chief Executive Officer; and that he controlled at least some aspects of First Washington Equities, LLC ("FWE"), an entity through which SMCRT funds were channeled.[9]

Mr. Jewell insisted throughout the adversary proceeding that he began operating out of the Rugby Avenue office in April 2008 – *i.e.*, well after the SMCRT loans were misappropriated by Mr. Rood – and that he had no involvement with Kore prior to August 2008, when he was named Chief Operating Officer in connection with the Rule 2004 examination of that entity in the bankruptcy case.  There was, however, ample evidence suggesting otherwise.  Appellees presented evidence that on or about April 17, 2006, the Board of Directors of Kore considered offering Mr. Jewell 750,000 shares of Kore stock in connection with consulting services he provided the company; that on or about August 8, 2006, he and Mr. Rood created a document detailing their plans to start a Nevada corporation, which was to be sold to Kore; that Mr. Jewell was identified as a member of FWE in its September 12, 2006, articles of organization; that he and Mr. Rood entered into a memorandum of understanding related to FWE on or about October 14, 2006, which called for Mr. Jewell to receive a $15,000 monthly draw; that he was listed as a managing

---

[9] By an order dated June 23, 2009, a default judgment was entered in favor of Appellees and against FWE.  (Bankr. Case. No. 09-00188, ECF No. 114).

member of FWE on an operating agreement dated December 1, 2006;
and that he previously worked for an entity called TBN, which
was under contract with Community First Bank, the payroll for
which was funded by Level One Capital Partners and FWE.  When
confronted with this evidence at trial, Mr. Jewell generally
denied its authenticity or accuracy and/or claimed to have no
knowledge.

Although there was a basis for finding that he was involved
in Mr. Rood's business operations prior to 2008, the bankruptcy
court found insufficient evidence that Mr. Jewell was directly
involved in the scheme to defraud SMCRT.  It determined that
"[t]he fraudulent representations attributable to Jewell appear
mainly in connection with the refinancing of loans made to
Michelex Corporation that were [originally] sold to SMCRT in
2006."  (ECF No. 1-1, at 14).

The bankruptcy court summarized the evidence with respect
to the refinancing of the Michelex loan as follows:

> In March of 2007, Hepler emailed a
> "Commitment to Fund Term Sheet" to Thomas
> Gramuglia ("Gramuglia") for a $500,000 loan
> to Michelex that was to be guaranteed by
> Gramuglia (Pl. Ex. 301).  Plaintiffs'
> evidence showed that Rood falsely reported,
> for several months, that the funds advanced
> by SMCRT were being escrowed.  Shortly after
> SMCRT sent a demand letter directly to
> Gramuglia demanding payment in full, Kore
> (through Source Bio-Plastics) and Rood were
> trying to close a deal with Michelex and
> AGPRO.  Part of that deal involved the use

25

of an "unencumbered asset." This asset,
however, was one of the parcels of real
property that had already been pledged by
Gramuglia for the SMCRT loan. Rood then
executed a Mortgage Partial Release that
released, without consideration, that
property from the lien securing the SMCRT
loan. Consistent with Rood's course of
conduct, SMCRT had no notice of the release
(Pl. Ex. 317). Rood also sent a fraudulent
payoff letter to First American Title that
resulted in the title company wiring
$250,000.00 to Blue Horseshoe (Pl. Ex. 312).
Plaintiffs alleged that this money,
unbeknownst to SMCRT, was then used to
finance the Kore/Michelex/Wind Farm deal in
New York.

Plaintiffs point to an email from
Jewell to Rood as evidence that Jewell knew
the $250,000.00 was used for the Michelex
deal (Pl. Ex. 490).[10] Jewell testified that
he was involved in trying to arrange an
asset purchase between Source Bio-Plastics
and a public company owned by Gramuglia, but
denied having any knowledge about SMCRT's
loan to Michelex (Trial Tr., 4/7/10, 95).
At the TRO hearing held on April 2, 2009,
Jewell testified that he did not begin
working on the Michelex loan until May 2008
(Hr'g Tr., D.E. No. 15, 100).

(*Id.* at 14-15).

In his discussion of the fraud count, Judge Mannes found:

Plaintiffs have not proven by clear and
convincing evidence that Jewell made
fraudulent statements in connection with any

---

[10] Plaintiffs' Exhibit 490 was an email from Mr. Rood to Mr.
Jewell, dated May 20, 2008, which reads: "Since agreeing to this
deal expenses & the debt from my company into Michelex itself
(i.e. Lease Payments, Manufacturing Maint, Payroll, General
Operating) is over 650K Tom [Gramuglia] has put in nearly $250k,
as we shared a lot of the monthly expenses[,] [d]o we really
need a how much & when type report?" (ECF No. 5-14, at 32).

26

> SMCRT loan.  While . . . the court senses
> that Jewell was involved in the fraudulent
> scheme concocted by the Defendants, there is
> insufficient evidence to show that Jewell
> had any direct communications with SMCRT or
> was a participant in the scheme.  Despite
> evidence that he played a role in the
> Michelex loan, the Plaintiffs have not
> proven that Jewell actually made any false
> representations to SMCRT in connection with
> that loan.  Indeed, Mr. Hillman testified
> that he had no interaction with Jewell at
> the time that the Michelex loan was made in
> June 2006.  Trial Tr., David Hillman Test.,
> 4/15/10, 19.

(*Id.* at 17).

Nevertheless, considering all the evidence presented at trial – and specifically, the evidence of a business relationship with Mr. Rood prior to 2008 – the bankruptcy court was "able to glean the extent of Jewell's involvement in Rood's scheme and, particularly with respect to the Michelex transaction, . . . that Jewell provided Rood with substantial assistance[.]"  (*Id.* at 25).  The court based "Jewell's liability . . . upon [a] finding that he conspired with Rood and Hepler to perpetuate fraud against SMCRT," but limited the award of compensatory damages to $500,000, the amount SMCRT sought with respect to the Michelex loan.  (*Id.* at 32).

On appeal, Mr. Jewell primarily challenges what he considers to be a contradictory analysis by the bankruptcy court.  Specifically, he argues that there is an

> inherent conflict between the findings of
> the Bankruptcy Court that Appellee[s]
> presented no evidence that the Appellant was
> involved with any loan and that the
> Appellant had absolutely no interaction with
> the Appellee[s] but then somehow . . . that
> the Appellant is liable for a loan provided
> two years before Appellant engaged in any
> activity with Michelex and absent any
> evidence that Appellant was related to the
> release of lien and improper payments
> claimed by Appellee against other
> defendants.

(ECF No. 17, 14-15).  According to Mr. Jewell, "no reasonable person could first determine that there was no evidence showing interaction between the Appellee and Appellant and then determine that Appellant should be liable for an unrelated transaction which occurred two years after the loan . . . that the Bankruptcy Court acknowledged was not connected to the Appellant."  (*Id*. at 7).

Insofar as Mr. Jewell asserts that there was no conclusive evidence connecting him directly to the misappropriated SMCRT loans, he is correct.  Indeed, Judge Mannes noted as much.  What he overlooks is that his liability was based on his involvement in the conspiracy with Mr. Rood and Mr. Hepler.  His knowledge of the fraudulent scheme may readily be inferred from a combination of factors, including his role as an officer of Kore, FWE, and other entities; his office on Rugby Avenue; records showing direct payments to him from Debtor Entity accounts; payments by Mr. Rood, through Debtor Entity accounts,

of his utility bills (like Mr. Rood, Mr. Jewell testified that he had no personal bank account); his involvement with Christopher Evans, a disbarred attorney who was prosecuted for conspiracy to commit wire fraud in the Eastern District of Virginia related to misrepresentations he made at the behest Mr. Jewell and Mr. Rood; and emails showing, *inter alia*, his solicitation of false W-2s from Mr. Rood for both him and his wife.  Given this evidence, it is virtually inconceivable that Mr. Jewell did not have knowledge of the illegal activities of Mr. Rood and Mr. Hepler.

The Michelex loan is significant because it constitutes an overt act necessary to link Mr. Jewell to the conspiracy.  By his own admission, Mr. Jewell was working closely with Mr. Gremuglia and Mr. Rood to obtain funding for property in New York associated with a project they hoped to develop.  The evidence showed that a source of funds for that project involved Mr. Rood's surreptitious release of a lien that secured SMCRT's Michelex loan.  Indeed, the May 20, 2008, email from Mr. Rood to Mr. Jewell directly refers to the proceeds derived from that release.  Thus, Mr. Jewell's efforts with respect to the Michelex loan, at the very least, provided "substantial assistance or encouragement to the principal to engage in tortious conduct." *Christian v. Minnesota Mining & Manuf. Co.*, 126 F.Supp.2d 951, 960 (D.Md. 2001) (in Maryland to establish

liability for aiding and abetting, "plaintiff must establish, '1) there is a violation of the law by the principal; 2) defendant knew about the violation; and 3) defendant gave substantial assistance or encouragement to the principal to engage in tortious conduct'") (quoting *Alleco*, 340 Md. at 186).

While Mr. Jewell may or may not have been a late arrival to the conspiracy, "the proven facts and circumstances, pieced together and considered as a whole," *Chenowith*, 180 Md. at 243, are more than enough to find, at the very least, that he aided and abetted Mr. Rood and Mr. Hepler in their illegal activities. Mr. Jewell should not be heard to complain that he was assessed damages associated with Michelex only – he could have been held jointly and severally liable with Mr. Rood and Mr. Jewell for a much greater amount.  Accordingly, the court finds the evidence adduced at trial supports the bankruptcy court's finding of liability for Mr. Jewell.

## IV.  Preclusion of Testimony as Discovery Sanction

Despite Mr. Rood's history of noncompliance with discovery requests throughout this litigation, his refusal to honor summonses, and his general efforts to obstruct any investigation into his affairs, he argues that the bankruptcy court erred in precluding him from testifying at trial as a sanction for discovery violations.  Similarly, Mr. Jewell complains that he

was erroneously precluded from calling Mr. Rood as a witness in his case-in-chief as a result of the same order.

Near the end of trial, SMRCT filed a motion *in limine* for an order prohibiting Mr. Rood from testifying. (ECF Nos. 5-27, 5-29). The motion recited that SMCRT propounded upon Mr. Rood a request for production of documents on or about November 17, 2009. When Mr. Rood refused to respond, SMCRT filed a motion to compel, which the court granted on January 27, 2010. The court's order required Mr. Rood to produce responsive documents within ten days, extended the discovery deadline for SMCRT, ordered that Mr. Rood pay reasonable attorneys' fees, and warned that further sanctions would be imposed if he failed to respond. When Mr. Rood again provided no response, SMCRT filed its motion for sanctions pursuant to Fed.R.Civ.P. 37(b)(2)(a). The court granted that motion on July 12, 2010, ordering that Mr. Rood was "prohibited from giving testimony in the above-captioned adversary proceeding." (ECF No. 5-19).

On the final day of trial, July 15, 2010, Mr. Jewell's attorney inquired as to whether the court's ruling precluding Mr. Rood from testifying would affect his ability to call him as a witness. (ECF No. 5-17, at 7). In opposing this request, counsel for Appellees responded, "it's very difficult to sever what Mr. Rood was willing to testify [to] as to Kore, as to Jewell, and as to his own personal circumstances," to which the

31

court replied, "[b]ut you're punishing Mr. Jewell and you're punishing Kore for Mr. Rood's misconduct." (*Id.* at 7, 9). According to Appellees' counsel, "Mr. Jewell was in a position to protect himself and certainly is in a position to provide his own testimony today, he's not been called by the defense yet, and to rely on Mr. Rood to support and defend him at this point is unfair under the orders of the Court[.]" (*Id.* at 10). After hearing from Mr. Jewell's counsel, Judge Mannes expressed reservations, but indicated that he would "adhere to [his] earlier ruling." (*Id.* at 11). At the request of Appellees' counsel, Mr. Jewell's attorney made the following proffer "as to what he would hope Mr. Rood would say on behalf of Mr. Jewell" (*id.*):

> Well, I propose to ask Mr. Rood questions about the operations of Kore, questions about the operations of, you know, his interaction with Mr. Jewell, when Mr. Jewell commenced. There's been a lot of discussion about Community First Bank. There's discussions about Bay Capital. Those are things that frankly Mr. Rood is the only one who has the ability to testify.
>
> I don't think Mr. Jewell can testify as to what happened with Bay Capital and Ben Lyons since he wasn't involved in any of that. There are a number of other issues regarding interactions between Mr. Jewell, Kore and Mr. Rood that happened both when Mr. Jewell will acknowledge he was in fact involved with Kore, and things that have been stated in this court that there's really any proof of other than some documents that were never executed, and I

> think Mr. Rood can speak to what occurred,
> some of the discussions that occurred, and
> these sorts of things.

(*Id.* at 12).   After Appellees' counsel stated, "[a]s to Mr.

Jewell, I didn't hear anything that Mr. Jewell couldn't testify

to," Judge Mannes "adhere[d] to [his] earlier ruling."   (*Id.* at

13).

As Judge Russell recently explained in *Meredith v.*

*International Marine Underwriters*, No. GLR-10-837, 2012 WL

3025139, at *4 (D.Md. July 20, 2012):

> Rule 37(b)(2) gives teeth to a court
> imposed order to provide or permit discovery
> under Rule 26(a)(2) by permitting a trial
> court to impose sanctions when a party fails
> to obey an order to provide or permit
> discovery. *Hathcock v. Navistar Int'l*
> *Transp. Corp.*, 53 F.3d 36, 40 (4th Cir.
> 1995). Among the sanctions available, the
> express terms of Rule 37(b)(2) permit a
> trial court to:
>
> (i) direct[] that the matters embraced
> in the order or other designated facts
> be taken as established for purposes of
> the action, as the prevailing party
> claims; (ii) prohibit[] the disobedient
> party from supporting or opposing
> designated claims or defenses, or from
> introducing designated matters in
> evidence; (iii) strik[e] pleadings in
> whole or in part; (iv) stay[] further
> proceedings until the order is obeyed;
> (v) dismiss[] the action or proceeding
> in whole or in part; (vi) render[] a
> default judgment against the
> disobedient party; or (vii) treat[] as
> contempt of court the failure to obey
> any order except an order to submit to
> a physical or mental examination.

Fed.R.Civ.P. 37(b)(2)(A)(i)-(vii).

In determining what sanction to impose under Rule 37(b)(2), this Court is guided by consideration of four factors: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of noncompliance, and (4) whether less drastic sanctions would have been effective." *S. States Rack and Fixture, Inc. v. [Sherwin-Williams] Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

Rule 37(b)(2), which is made applicable to bankruptcy proceedings by Fed.R.Bankr.P. 7037(a), "gives the court a broad discretion to make whatever disposition is just in light of the facts of the particular case." 8B Charles Alan Wright, et al., *Federal Practice & Procedure* § 2289 (3d ed. 2010); *see also Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 518 (D.Md. 2000) ("Federal district courts possess great discretion to sanction parties for failure to obey discovery orders.").

Although the bankruptcy court did not provide an explanation with regard to its ruling as to Mr. Rood, the record of the adversary proceeding, in effect, speaks for itself. Despite Mr. Rood's argument to the contrary, a finding of bad faith would clearly have been warranted. Given the dubious nature of his prior testimony in the case, and considering the substantial evidence of his fraudulent conduct, his testimony would not be likely to carry much weight with Judge Mannes.

34

Moreover, considering his absolute refusal to comply with numerous court orders to provide discovery to Appellees, the imposition of this sanction was warranted, particularly where he was expressly given fair warning that a more severe sanction would result from his continued noncompliance.

With respect to Mr. Jewell, there are conflicting considerations involved, as Judge Mannes noted.  On the one hand, he was effectively sanctioned for the conduct of Mr. Rood. On the other hand, permitting Mr. Rood to testify as a witness for him would likely have constituted an end-run around the sanction.  Ultimately, the critical factor as to Mr. Jewell is the degree of prejudice he suffered as a result of the ruling. In his brief, Mr. Jewell argues that the ruling was indicative of the bankruptcy court's hostility toward him and that it was evidence of "malice," but he cites no prejudice that resulted. Indeed, given Mr. Rood's credibility problems, it is difficult to conceive how his testimony could have helped Mr. Jewell's case.  Judge Mannes had broad discretion in this ruling, and there is no basis for finding that he abused it, or that it affected Mr. Jewell's substantial rights.

## V.  Admission of Expert Witness

Both appellants complain about the admission of Suzanne Hillman's expert testimony on several grounds.  Mr. Rood argues, in conclusory fashion, that "[t]he trial Court erred when it

denied the motion to strike the testimony of Suzanne Hillman based on the reasons detailed in the motions." (ECF No. 26, at 50). Such a meager argument barely deserves notice for it fails to direct the court to any pertinent part of the record. Mr. Jewell contends that the bankruptcy court erred in allowing the expert to testify because the testimony was based on illegally obtained documents. (ECF No. 17, at 21). As to that objection, Judge Mannes ruled on April 6, 2010:

> The issue of illegally obtained evidence in civil cases was discussed by the Supreme Court in the case of United States versus Janis, J-a-n-i-s, that appears at 428 US 433. Justice Blackman speaking for the Court talked about the exclusionary rule and he said at page 447: "In the complex and turbulent history of the rule, the Court has never applied it to exclude evidence from a civil proceeding, federal or state." While there's not a lot of law, there is – a lot of civil law on it, there's a case out of the Southern District of New York called Burka versus New York City Transit Authority that tells us the purpose of the exclusionary rule is to -- the sole purpose of the exclusionary rule citing several Supreme Court cases is to deter future unlawful government conduct. I am not going to exclude those documents on the grounds they were illegally obtained. Thank you.

(ECF No. 5-59, 16-17).

Mr. Jewell now argues that the evidence was tainted because it was not obtained in good faith and because Appellees and their expert somehow participated in the wrongful acquisition. He bases this argument on the motion filed by Kore on March 2,

2010 (ECF No. 6-126), which asserted that Ms. Hillman's report was based on documents that should have been returned as ordered in the receivership proceeding in the Circuit Court for Montgomery County.  The motion cites *Weaver v. ZeniMax Media, Inc.*, 175 Md.App. 16 (2007), which held that a circuit court has inherent authority to sanction conduct that occurs prior to the commencement of litigation, citing in turn to *Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D.Wash. 2002).  Mr. Jewell cites to additional cases, including *Lipin v. Bender*, 84 N.Y.2d 562, 572 (N.Y. 1994) (improper review of privileged documents); *Wanderer v. Johnston*, 910 F.2d 652 (9th Cir. 1990) (sanction for flagrant disregard of discovery rules); and *Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319 (S.D.N.Y. 1997) (inherent equitable power to limit use of improperly obtained material).  While Judge Mannes understood the argument to be based on the obtaining of documents through abuse of the court ordered entry – and thus to implicate the exclusionary rule for official misconduct – he nevertheless declined to countenance an argument based on the asserted misconduct of the receiver and/or his agents.  This ruling was not an abuse of discretion, particularly where Appellants never, either before the Bankruptcy Court or here, delineate specifically which documents are at issue.  The Bankruptcy Court was painfully aware of the difficulty Appellees encountered in attempting to obtain

discovery from Appellants and the other defendants, as well as the proceedings that occurred in circuit court.  The authority of a court to sanction misconduct is an equitable one and, given all that transpired in this litigation, it was not an abuse of discretion for the court to permit the expert testimony based on all of the documents examined.

The admissibility of expert testimony is governed by Fed.R.Evid. 702 and 703, which essentially vest discretion in the trial judge to admit evidence if the specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue.  The testimony must be based on sufficient facts or data; it must be the product of reliable principles and methods; and the expert must reliably apply the principles and methods to the facts of the case.

During the very lengthy proceedings in the bankruptcy court, Ms. Hillman testified on numerous occasions, and her testimony and reports were an essential part of Appellees' case and the court's ruling.  From time to time, counsel for Mr. Rood did attempt to raise objections, including a challenge to her neutrality, given her relationship to Southern Management CEO David Hillman (ECF No. 5-44, 52-58), and perhaps to her credentials, based on the failure of her website to reflect that she was a forensic accountant. (ECF No. 6-37, 31-2.)

Without any specific argument from Appellants as to how Judge Mannes purportedly abused his discretion in admitting the testimony of Ms. Hillman, the decision to admit the testimony will be affirmed.  The objections noted, at best, went to the weight of the testimony and not to its admissibility.

## VI.  Evidentiary Rulings

Mr. Jewell complains, generally, that "[t]he Bankruptcy Court consistently allowed evidence to be presented without any foundation or context."  (ECF No. 17, at 24).  He specifically cites only one challenge to the admission of Plaintiffs' exhibit 30 at trial, a "Resolution of the Board of Directors of Kore Holdings, Inc." which, if executed, would award 750,000 shares of Kore stock to Mr. Jewell on April 17, 2006 "in consideration of consulting and services rendered" to Kore.  The document is cited by Judge Mannes among several items of evidence demonstrating that there was a business relationship between Mr. Jewell and Mr. Rood and Kore prior to April 2008.  He argues that "this evidence is nothing more than an unexecuted resolution for a publicly traded company that was never put into action" and that, as a public company, the sale of stock would be reflected by other records.

The document in question apparently was first discussed during the testimony of Suzanne Hillman at a hearing on various motions on April 22, 2009.  (6-37, 53-4).  Ms. Hillman said it

was a "true and accurate document" retrieved from the electronic data seized at the Rugby Avenue office during the receivership proceedings in the circuit court. Defense counsel objected, arguing "this is a document that could be a draft. We have no idea what it is. It's not executed so we don't know the truthfulness or lack of truthfulness. . . . The only thing we know is it was in a computer and that it was a draft of something that may or may not have been voted upon, it may or may not have represented what actually happened." (*Id*. at 53-54). Counsel for Appellees responded that the document was not being offered for the truth, but rather to show "some notice of Mr. Rood's involvement with various parties and some intention that Mr. Jewell, . . . identifying shares of stock being issued." The court deferred ruling at that time.[11]

Trial courts enjoy wide discretion in determining the admissibility of evidence. "Assessing the probative value of [the evidence], and weighing any factors counseling against admissibility is a matter first for the [trial] court's sound judgment[.]" *United States v. Abel*, 469 U.S. 45, 54 (1984); *see also* Fed.R.Evid. 401 ("Evidence is relevant if . . . it has any

---

[11] The parties do not point to a later explicit determination of the admissibility of the document, but Appellees and Judge Mannes cite to the document as being in evidence. It is listed as having already been admitted in Appellees' exhibit list submitted prior to the beginning of trial. ECF No. 38.

tendency to make a fact more or less probable that it would be without the evidence; and . . . the fact is of consequence in determining the action"); Fed.R.Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence").

Considering that Mr. Jewell testified throughout the adversary proceeding that he did not become associated with Kore until mid-to-late 2008, this document showing that he was at least considered for an award of 750,000 shares of stock in return for consulting services in 2006 is certainly probative. That the document was unexecuted, in and of itself, was of little consequence. There was no objection based on the authenticity of the document as being found on the computer in the Rugby Avenue office.[12] Judge Mannes' admission of the document in question does not constitute an abuse of discretion.

## VI.  *Res Judicata*

Prior to the instant case, SMCRT and Tysons commenced a separate adversary proceeding against Mr. Rood by filing a verified complaint to determine dischargeability of debt,

---

[12] Testimony later in the Adversary Proceeding described the process for the seizure of the computers and the imaging of the electronic data. See, generally, ECF No. 5-59.

alleging fraud and related claims.  (Bankr. Case No. 09-00058, ECF No. 1).  When Mr. Rood did not respond within the requisite time period after service of the complaint, the plaintiffs moved for default judgment.  (*Id.* at ECF No. 5).  The next day, SMCRT and Mr. Rosen commenced this adversary proceeding from which the instant appeal arises.  By an order issued April 28, 2009 in Adversary Proceeding No. 09-00058, the bankruptcy court entered a default judgment in favor of SMCRT and Tysons, and against Mr. Rood, in the amounts of $13,876,353.47 and $2,626,189.30, respectively.  (*Id.* at ECF No. 12).

In the instant adversary proceeding, Mr. Rood summarily raised *res judicata* and collateral estoppel as affirmative defenses in his answer.  The record on appeal does not reflect that he moved to dismiss or for summary judgment on those grounds, however, and it appears that he did not specifically raise the issue prior to submission of his proposed findings of fact and conclusions of law after trial.  (ECF No. 5-9, at 9-10).

In mentioning the prior default judgment in the memorandum of decision related to the case on appeal, Judge Mannes specifically noted that the judgment would be "subject to the 'single recovery' rule, that is, only a single recovery is allowed where the same damages are sought under different legal theories."  (ECF No. 1-1, at 2 n. 1).  He further explained:

> Because there are multiple defendants, any
> amount paid by anybody . . . for and on
> account of any injury or damage, should be
> held for a credit on the total recovery in
> any action for the same injury or damages to
> prevent the plaintiff from recovering
> multiple times from the same harm.
> Moreover, the court notes that the
> Plaintiffs' recovery from Rood in the prior
> case (AP No. 09-00058) should be credited
> and thus damages in this case are not an
> additional recovery but rather co-extensive
> with that judgment. The plaintiff is not
> entitled to double recovery for the same
> injury.

(*Id.* at 30). In the order entering final judgment, moreover, the bankruptcy court expressly stated that "SMCRT's recovery from Robert Fulton Rood, IV on the damages awarded by the court in Adversary Proceeding No. 09-00058 shall be treated as a credit against the damages awarded to SMCRT . . . herein, as the damages in both proceedings are co-extensive." (ECF No. 35-1, order at 3).

Nevertheless, Mr. Rood argues on appeal that the judgment below is barred by *res judicata* and/or collateral estoppel. Insofar as he points to no ruling in the bankruptcy court finding to the contrary, however, there is essentially nothing for the court to review. Similarly, he argues, apparently for the first time on appeal, that Mr. Rosen somehow lacked standing to prosecute the action below, a claim that is plainly without merit. *See* 11 U.S.C. § 544; *In re Fabian*, 458 B.R. 235, 256-57

(Bankr.D.Md. 2011) (discussing standing of the bankruptcy trustee to recover fraudulent conveyances).

While the court "may, in its discretion, decide issues presented to it in a bankruptcy appeal even though the issues were not raised in the court below," *Debartolo Properties Management, Inc. v. Devan*, 194 B.R. 46, 49 (D.Md. 1996) (citing *Levy v. Kindred*, 854 F.2d 682, 685 (4th Cir. 1988); *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985)), it declines to do so here. The *res judicata* doctrine was "designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161-62 (4th Cir. 2008) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)). The doctrine is not properly utilized to nullify a judgment after trial, particularly where, as here, the careful language of the bankruptcy court ensures that SMCRT may collect only a single recovery.

## VII. Conclusion

For the foregoing reasons, the judgment of the bankruptcy court will be affirmed. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

44